Hi, would the lawyers approach the bench and tell us who you represent and your name, please. Good morning, Your Honors. I am Rachel Sher. I'm here on behalf of Petitioner Appellant, along with my colleague Allison Triggs. Welcome. Good morning, Your Honor. My name is Michelle Grimaldi-Stein. I'm an Assistant State's Attorney, and I represent the people of the state of Illinois. Good to see you. Okay. We're prepared to begin. Each side will have 15 minutes. If you need additional time for rebuttal, you can reserve it. Thank you. Again, good morning. I would like to reserve five minutes for rebuttal, and to that end, I would request the Court's permission that my colleague be able to make that argument on rebuttal. Sure. That's fine. Thank you. Could we just have the spelling of your name? Sure. It's Allison A-L-I-S-L-N Triggs, T-R-I-G-G-S. Great. Thank you. May it please the Court, I would like to begin by focusing on the first issue in the brief, the actual innocence claim. It's necessary to begin by going back to the facts of May 24th and May 25th, 1990. Now, on May 24th, 1990, Mr. McNeil completed his GED exam. This is not a disputed fact. The test results show that this is, in fact, the day when he finished taking the test. After the test, his father picked him up and took him to the Makin's home and dropped him off that evening. Mr. McNeil was friends with David Makin, who was Leola Makin's son, and oftentimes he would go over there for the evening for dinner and sometimes to spend the night, and that is what he was doing that evening. After dinner, Mr. McNeil, along with Mr. Makin, invited some friends over to the Makin's home, and included in those guests was Stephanie Boyd Grady. Ms. Boyd Grady arrived at the Makin's home at about 10 p.m. that evening and stayed until 2 a.m. in the morning when she left. She testified that when she left early that morning, which would have been May 25th, that Mr. McNeil was still in the basement at the Makin's home. Now, this sequence of events was corroborated by three different alibi witnesses at the evidentiary hearing. Leola Makin, her son David Makin, and Stephanie Boyd Grady all testified that they were with Mr. McNeil the evening after he took his GED exam at the Makin's home in Gary, Indiana, and they placed him there until the next morning of May 25th. Counsel, not to interrupt, I think that all of us have a pretty good sense of the facts and we understand how important those particular facts are to the issue in this case. But a big question, at least that I have, is the delay in time. The time here is very disturbing. Sure. You have a 1990 murder, and then I'm not sure exactly when would you say your client first comes forward with this? Well, he first came forward with his alibi in 1991 after he was extradited from ñ he was originally arrested in November of 1990 and held in Lake County, Indiana, until about March of 1991. And you're telling us that in 91 he told his attorney? He told his trial counsel in 1991. That would be Paul Strzalka, correct? Paul Strzalka, correct. Who denies that that occurred? Well ñ You said he would have made a note of it if it had occurred. He didn't deny that it occurred. He did say that he would have made ñ He said his habit would be or his routine would be to make a note of it. His routine, he did testify. He would find out and get an affidavit if that were ñ or he'd talk to the person. Didn't he go to Indiana, actually drove to Indiana himself to find out whether one of the stories could be corroborated? He did testify at the evidence you're hearing that he went to Indiana for a trip. At first there was some confusion because he seemed to have mistaken that for another trip he may have taken to Indiana on another case. So there was a little bit of ambiguity with regards to which case that may have been related to. A long time later. Certainly. Certainly. But essentially he relied on the way that he commonly dealt with cases such as this and it sounded like he was a public defender with quite a bit of experience, had a certain approach to interviewing clients and defending clients. And certainly an alibi would be something that would be talked about, explored, et cetera. And that's pretty much what he wanted the trial court, when the trial court had the evidentiary hearing, to rely upon in terms of resolving this particular question. He did testify that it was his practice that if he was told an alibi, he would make an investigation. Now, that is somewhat of a leap to say that in every instance, in every case he has ever represented as a public defender, certainly is a very large caseload. I mean, several interceding cases in the interim between 1992 when he defended Mr. McNeil to when he testified. More importantly, none of those notes could be recovered. He said he didn't have them. The state, I believe before the evidentiary hearings, did make an effort to locate the case file for his 1992 case and that couldn't be located with the public defender office. So it's really that there is an absence of certainty. Mr. McNeil, however, says that he did tell him about the alibi. Now, what is the standard of review here? Because it's an interesting, the absence of certainty, it's an interesting phrase. But what is the standard of review that we will be using in resolving this issue? Well, if we're speaking about the ineffective assistance of trial counsels. Well, I think right now we're talking about the innocence claim. Well, then if we go back to the actual innocence, it is basically three prongs have to be met. The evidence has to be newly available, which really just means that it was not available at the trial. It has to be material and non-cumulative. And it has to be evidence that if presented on retrial, would create a likelihood that there would be a different result. And all of those prongs are met here. Because this evidence, the alibi witnesses were not presented. That, I think, would be on that point. I mean, you've already had the evidentiary hearing. I'm not asking you what standard needs to be met in order to allow an evidentiary hearing to go forward. Oh, I see. On the actual innocence. What I'm asking is, as a reviewing court. Sure. Do you agree, for example, that according to the Supreme Court case of People v. Morgan, the reviewing court must consider whether the evidence was sufficiently compelling that a decision by the court to reject that evidence was manifestly erroneous. So are you agreeing that we are in a manifestly erroneous scenario? Yes. Yes. The level of review for this court would be whether or not it was against the manifest weight of the evidence. You are correct. And given that all elements of the actual innocence claim were met, as I just said, it is against the manifest weight of the evidence, the finding that, in fact, this evidence was not newly available. No, I understand that. I mean, but my concern is would we have to say that the judge was manifestly erroneous in terms of the ruling that he made when he rejected your version of what happened here and found more credible the state's version of what happened. Yes, that is the ruling that this court would have to make in order to reverse his ruling. Okay. Yes. Would you also agree that what we have here is a mass of conflicting evidence that the judge, any judge, would have to sort through and come and say, after the evidentiary hearing, I believe this person, I don't believe that person. The evidence leans this way, and you would admit, I think, in all candor, that that's a difficult burden. Certainly. Counsel, following up on what he's saying, you agree that there's a lot of conflicting evidence? Yes, there is conflicting evidence. Then how do you meet your burden of establishing that it's against the manifest weight if it's conflicted? Well, there are three witnesses in addition to Mr. McNeil, not even considering Mr. McNeil's testimony, who place him in the same place on the same day. We're talking about the Meghans and we're talking about Stephanie, correct? Correct. And whether or not there's – But, once again, let me go back to the problem of how could those, not one, not two, but three people – Close friends. Yeah, have failed to or have allowed this man to languish for 15 years without coming forward. Do you follow what I'm saying? Absolutely. I mean, there's just a disconnect there in terms of what would, in common sense, I would experience what a person would do if, you know, a friend were in jail. Certainly. Just be yelling and screaming about, but I was with him that night, so it couldn't have happened. Do you follow me? I do, and I think there are two different explanations, one for Ms. Boyd-Grady and a separate one for the Meghans. With regard to Ms. Boyd-Grady, she testified that after that night, the evening they were together on May 24th into the morning of May 25th, 1990, she did not see Mr. McNeil again. She graduated a year later before he even went to trial, left Gary to go to college, went on to get a master's, left the state, had a family. So the friendship really isn't as close as it is with the Meghan family, but you have to admit the Meghan family, the friendship preexisted, the homicide, I mean, this was a much longer relationship. That is true. However, the Meghans were never aware of the date of the crime until after he had already been convicted. And he being, at the time I believe he was 19 or 20 when he was arrested, incarcerated, I am not closely familiar with the conditions in the Cook County Jail where he was being held, but he said that he made every effort to let his attorney know that these are the people you need to contact. He did not have their contact information anymore. He admittedly was bad with numbers, didn't remember their telephone off the top of his head, did give a street name for his attorney to go and pursue that investigation, which clearly didn't happen, but it wasn't until after the conviction that everything sort of fell in place. There's no reason for the Meghans to have independently known that the date we happened to have him over because he finished his GED was also the date of this crime when they weren't privy to the details of that crime before he was tried. So that would be the argument that it wasn't information that he had before he went to trial or that any of these witnesses independently would have had enough information to come forward on their own and to assist him prior to trial. Your interpretation certainly has some credence to it, but I guess what I think all three of us are saying is you're given a mass of information in the hearing, the trial judge is, and it has to sort through it and sift through it and pick up the salient facts and then come to a determination. And clearly it's conflicting, as you said very candidly and honestly admitted that. How do we go back and say, well, no, you got that one wrong or you should have interpreted it the way you interpreted it, not the way that you, the trial judge, interpreted it. That's an incredibly heavy burden. I think we're looking for some guidance from you, help from you, in terms of is there one thing that says to you this could not have been, I mean you begin your brief saying he did not commit the murder. Tell us, give us, I mean the last thing any of us wants is for someone who didn't commit a murder to spend his life in prison. So give us something to hang our hats on. I think that one line of testimony that was absent from Judge Coghlan's order and so seemingly his consideration of the issue. What did he overlook? Tell us what he overlooked or didn't get right. Stephanie Boyd Grady's testimony. He did not give her testimony a lot of weight. And, in fact, her testimony really cements the date of when this gathering took place and the fact that she was with Mr. McNeil the evening into the early morning of the time that it took place. The State says in its brief that, no, well, it was probably later when he passed the GED because they were talking about her going to Atlanta and it was confusing as to whether it was May 24th or sometime later in June 1990 when essentially the party took place. And that's what they're saying. They're saying, no, you're interpreting it wrong. You wouldn't have a party. They have all sorts of reasons. You wouldn't have a party just because you took a test, unless it's a bar exam, then you have a party. But you interpret it any number of ways, obviously. But I guess they're saying, no, that was wrong. She was wrong 15 years later on the date that she was remembered in being over at the house. The State misconstrues Ms. Boyd Grady's testimony. In fact, there were several pieces of her testimony that lend itself to the fact that this party did occur on May 24th. One, she said that the day after, she recalls going to Dayton, Ohio to visit one of her sisters and then coming back from that weekend and still having two, two and a half weeks left of school. That's the first thing. The second thing, she also said that she recalled having relatives come into Indiana for a June graduation and that she remembers this being several weeks after this gathering had happened. And she does testify to the fact that she went to Atlanta for the summer. But while I'm not familiar with the school schedule in 1990, I'm presuming that, like now, it probably ended early to mid-June. And Mr. McNeil and Ms. Boyd Grady did not see each other that often. So for either Mr. McNeil or Ms. Boyd Grady to say, you know, this was the last time we'd see each other, and then a couple of weeks later she went away for the summer, May 24th is a couple of weeks before she would have gone to Atlanta. The timeline as Ms. Boyd Grady sets it up makes sense. And there's no reason to doubt... Was she in college at the time or was she in high school? She was a junior in high school in 1990. 16 or 17, because she graduated high school in 91. And did the defendant testify at the trial? No. Mr. McNeil did not testify at his trial in 1992. No. So... This is... So given that information and given the fact that none of that was referenced in the judge's order, it seems as though it wasn't taken into consideration. And I think that is the evidence that would lend weight to the fact that his conclusion was against the manifest weight of the evidence, that you have... Why do you say that none of it was considered by the judge? Well, Ms. Boyd Grady's testimony, and reading his order, which one would presume lays out his thinking for deciding the way he did... It was pretty short. Well, it was about 10 pages. And it does spend some time talking about both the Makin's testimony, but really glosses over, or I'm not even sure that it does mention her testimony. And to have three witnesses all say, I know we were together this date, and really the only witness that the state put on, Mr. Strelka, most of his answers, as you pointed out before, Judge, it's hard to recall events that took place 17 years prior, but his answers were quite honest. I can't say with certainty whether he told me the names of the witnesses. I can't say with certainty whether there was an investigation. So most of his answers were, I don't know. Whereas everyone else's answers were, I know, and I remember it being this day, and we know it was this date because we know it was after the GED exam. Should we attach any significance to the fact that the judge couldn't find his notes so he could verify whether or not he was, in fact, given information concerning the alibi witness? Give any weight to that? They searched for the notes, correct, but they could not locate them. Correct. I don't know what the filing system is like at the public defender and how realistic or unrealistic it would have been to find that file. Certainly it could have been very helpful, but I think the fact that there is nothing of record to say that he didn't tell him is important. We can't go to his notes and look at them and determine, based on the notes, as Mr. Straffa says, that's where the information would be. Don't we have to look at the nonverbal conduct? I mean, I don't know, the fact that the trial went on and there was never any comment by your client that, you know, I have an alibi, I have three witnesses who were with me at that time. I mean, it's his nonverbal conduct. I'm telling you what he did and what he failed to do. Well, in fact, he did file. He was in the courtroom. He did file two motions for a new attorney in April and May of 1991. Now, these were boilerplate motions that I'm sure he got from the prison law library or something like that, and he testifies to that. So it doesn't lay out any specifics more than just sort of a boilerplate motion. However, he testified that he filed these motions, and this is so he met Mr. Straffa in March. He filed his first motion in April, the second one in May. They both were denied. But he testified that he felt as though Mr. Straffa was not pursuing the investigation as he would have liked and not getting in touch with these alibi witnesses, and that was the impetus for him filing these motions for a new attorney. But it didn't say that in the motion, though. No, it did not. That would have been the classic opportunity for him to say he's not doing his job because he's not talking to my alibi witnesses. And, you know, the fact that he took the time to file the motions in April of 91 and then a year later, you know, went to trial, it just would make sense that at that point common sense would just dictate that he would have said in the motion he's ineffective because he hasn't spoken to my alibi witnesses. I mean, it's about four more words. Frankly, at the time he filed those motions, he was 19 years old, had been in prison for six months, and, I mean, he would admit that he was somewhat unsophisticated with the legal system, as I would imagine most people are who are not attorneys, and he was doing the most he thought he could do at that point. And given that it was just a boilerplate motion, that at the time is what he felt was sufficient to do. Do we have transcripts from those hearings and motions? He's not calling people I know who can give me an alibi or anything like that? Have you ever seen those?  I do not recall whether the motion for a new attorney, pardon me, I do not recall if there was testimony to that exact point. Or even a statement, you know, a judge, you know, usually they'll come in and say, hey, judge, you know, I'm not getting adequate representation, he won't even call my alibi witnesses. Something like that would obviously go a long way. Certainly. You don't remember seeing that? No. I mean, the motions were both dismissed. Denied, yes. Okay. Can you get us the record and supplement the record page where those motions can be found, the two motions for removal of Ms. Kuchelka? Yes. Is it all right if I? Not at this moment. Certainly. That is no problem. And speaking of, now that we are sort of segwaying into the ineffective assistance of trial counsel issued and talking about Mr. Shalka, it is important to focus on the fact that at these hearings, he could not say with any certainty whether or not he knew of this alibi witness. And the court has held that not investigating an alibi, not presenting alibi witnesses at trial, specifically when they have exonerating testimony, meets the first prong of Strickland. And it is certainly not a leap to also assume that had this been presented at trial, that there is a reasonable probability that the outcome of the trial would have been different. And we would argue that is why Judge Coghlan's findings on that claim was also against the manifest weight of the evidence. Right. Well, I wrote the Morris case and a couple of the other cases that stamp that proposition, but I know that they can be distinguished from what we have here because it was very clear from those records that there were alibi witnesses. It was a failure to investigate, and there was no reason given for that failure. I think there was a bit of a disconnect here in terms of what we have here. It's basically, as you said, sort of the lack of certainty or the word that you used, the degree of certainty. Do you see the dilemma that we have, counsel? There's nothing to corroborate the fact that the attorney, in fact, received the information. If we had his notes, and if his notes established that he was never given the information or, in fact, he was, well, that corroborates the fact. Or if we had the transcripts from the hearings on the motions for a new attorney, where maybe he said, you know, my attorney isn't conducting an investigation, then we'd have something to support the fact that, in fact, he gave his attorney that information. But we just have two people who disagree about whether or not they received the information. Now, granted, the judge said, I'm not certain that he didn't tell me about the alibi witnesses, but we just have a disagreement between some witnesses. There is a dilemma. However, I think one can't just look at what is not in the record, but you need to look at what is in the record. And what is in the record is Mr. McNeil saying he told his attorney, his attorney saying, I can't say for sure one way or another, and three other people saying, yes, we were with him. So there was an alibi. Then we have other people testifying under oath and obviously pursuant to deals, but they said, no, we were with him, and he was the one who pulled the trigger. So you're putting one thing on one side of the scale, and there's a lot more to go on the scale. So that's what the judge was confronted with. That's correct. But I think if we looked at what the state's evidence was at his trial, it was far from overwhelming. They put on 15 witnesses. The only person who placed Mr. McNeil at the scene was Ms. Nieves, who, as you referenced, did get a 15-year plea deal. She served seven. She was an unreliable witness at best. She had trouble recollecting very simple facts like her own address at the time of the crime. She said she was terrified of Tony after that, but then testified she kept going over to their house to hang out with him. Arguably, had this evidence also been put on, being there was no physical evidence tying him to the crime, and you have this one shaky witness, there is a reasonable probability. Wasn't there a fingerprint of Ms. Burgos? There was a handprint of Ms. Burgos, but no physical evidence tying Mr. McNeil to the crime. But that tended to corroborate the story that they were all together, and they were going to rob the victim. The story about her soliciting him for a sex act and then getting in the car with him, and that would account for her hand on the car. Why would she have her hand on the car of a perfect stranger otherwise? I mean, that's corroborating evidence. Well, Ms. Burgos and Ms. Nieves might have been there, but there's still no evidence placing Mr. McNeil there. And Ms. Burgos never testified at his trial. Their testimony said he was there. Burgos testified later, didn't she? She did not testify at his trial. She never did testify against him? No. And she was also given a deal, I believe, of 26 years. Okay. Yeah. Well, if there are no further questions, I would like to reserve the rest of the time for rebuttal. Thank you, Counsel. Thank you. Good morning, Your Honors. Again, may it please the Court, my name is Michelle Grimaldi-Stein. I'm an assistant state's attorney. In answer to your questions, Your Honors, about the transcripts of the motions for the new attorneys, they appear at June 4th of 1991. I do not have the volume here, but because the defendant took apart the record and put it back together on his own, I believe that that would be in Volume 1 of 2 or Volume 1 of 4. And I can tell you with certainty that during that motion, the defendant never said anything about his attorney not investigating his alibi witnesses. Now, as this Court has clearly recognized, and as Counsel has routinely ignored, the procedural posture of this case is not a de novo review of the entire evidence presented at the evidentiary hearing. The facts of this case have been determined by Judge Coughlin, who is in a superior position to determine those facts, because he saw those witnesses testify. He saw the defendant testify. He saw the defendant's witnesses testify. He saw Judge Strauka testify. He read the investigator's reports from the state's attorney's office involving interviews with the defendant's witnesses. He read all the various affidavits where this alibi morphed and evolved and got bigger and got better as the case went on. And he determined that the defendant fabricated this alibi. He determined that there was no alibi, that it was a lie, that the defendant perjured himself, that he never told Judge Strauka the names of these witnesses, that Judge Strauka, therefore, could not possibly have been ineffective in not investigating and presenting those witnesses because he didn't know about them at the time of trial. The Court explicitly found that the defendant was not diligent in presenting this claim and that the defendant's witnesses were incredible. And the only issue before this Court today is whether the record supports those findings. And if it does, this Court must grant deference to the trial court's findings and affirm the denial of relief. And it is clear from a review of the record that there is ample evidence supporting those findings. As an initial matter, it should be noted that the defendant can't simply proceed in this Court on a theory of newly discovered evidence. The theories that he proceeded below, and it was his burden below, so it does not matter whether the notes of Judge Strauka are there or not because Judge Strauka testified, I don't recall this happening. I cannot say with certainty that I don't recall, but the defendant conveniently omits the last part of that. But it was my practice, if I were told about alibi witnesses, to name them in the answer to discovery. And we have an answer to discovery in the record, a supplemental answer to discovery, where Judge Strauka did that. And you know what? Did he have a proper name or an address? No. All he knew is that there was somebody named Indio out there that the defendant said would help his case. Do we know that Judge Strauka tried to investigate that claim? We know that because Judge Strauka talked at the evidentiary hearing. He said, I remember going to Gary on a very icy day where my car skidded on the ice looking for Indio. Clearly, was the judge going to say absolutely definitively, without my notes in front of me, I can tell you unquestionably? No, he didn't say that. But he did say, I don't have any memory of it. It isn't in keeping with how I would have conducted my case if it happened. And based on that evidence, the trial court was absolutely within its bounds to say it never happened. Now, alibi. The reason why the defendant can't now pick and choose his legal theories is because his legal theories are legally and logically inconsistent with each other. And as a result, his case falls one under the weight of the other. You can't have newly discovered evidence of actual innocence. First of all, alibi evidence. Unless they've tied you up, blindfolded you, and taken you somewhere where you don't know, you've got to be the source of that alibi evidence. You as the defendant knew where you were on the date of the crime. So alibi evidence can't be legally newly discovered evidence. It cannot meet the definition of that. That's number one. Number two, you can't have new evidence that's really old evidence. You've got to choose one or the other. Now, it's clear why the defendant tried to proceed under these two theories. He needed the legal theory of newly discovered evidence to get around his inability to show cause and prejudice for his ineffective assistance of counsel claim. And he needed his ineffective assistance of counsel claim to get around the fact that he couldn't show due diligence for the newly discovered evidence claim. Now, the fact that the judge at second stage in this case decided to err on the side of caution, to not rule out the defendant's claim on a legal theory, which is a valid legal basis for dismissal, but allowed this case to go forward in order for the court to observe the defendant's witnesses, to make those credibility findings, that doesn't change the fact that in the final analysis, the defendant's argument caves in on itself. He can't have it both ways, and he can't meet either legal theory for a claim. The facts are equally against the defendant, and the record supports the trial court's findings. The fact, the defendant's whole argument here, against the manifestly erroneous standard is, well, we had four witnesses, and the state only had one, so the judge should have believed us. That's not the law, and wishing isn't going to make it so. The defendant could have paraded in a hundred witnesses if none of them were credible. The court would have been within its right to reject all of their claims. Now, if you look at the various reasons of the record, which support the trial court's findings, you will find that there is no choice here but to affirm the trial court's ruling. The implausibility, as Justice Roussard recognized, of the long-lost alibi,  like a member of their family, would do nothing to find out. First, that they found out that you were arrested and assumed that it was for a minor offense. Then they find out that it wasn't for a minor offense, that it was murder. That they didn't find out what day the murder was occurred. This is somebody who's supposed to be at your house so much of the time. So maybe you could have provided an alibi form, but you didn't do anything? There's an old expression that a defendant has to tell a reasonable story or be judged by its improbabilities. And the improbabilities in this case are exponential. It is improbable that the defendant knew he had an alibi, knew he had witnesses, knew he had an opportunity, at least enough information where somebody could go out looking for them, knew he had an attorney that would investigate, told the attorney, and that that defendant, who was so savvy, so clever, that he was able to get a new attorney appointed in this post-conviction, private counsel, that defendant wouldn't, and who was standing up before the trial court, even at 19, and saying, I need a new attorney, this one is not representing me, that that defendant wouldn't say, I told him about my alibi witnesses, and he's not doing anything? It's improbable that when Leola Macon came to that sentencing hearing to testify for him, the defendant didn't stand up and say, that's her, that's the woman that can provide me with an alibi, and I told my attorney about it two years ago. It's improbable that once the defendant raised counsel's ineffectiveness in his first two post-conviction proceedings, he never mentioned this alibi, or counsel's failure to investigate it. The alibi itself is equally improbable. It's improbable that a proctor is going to look at a test, that's a standardized test, without a key card, and say, oh yeah, looks good, I think you passed. It's improbable that a party would be held on the date that an exam was completed, and not the date that the examinee was notified of his passing. It's improbable that that party would also mark the birthday of a child who's not there. If you look at the alibi, and you look at how it evolved over the years, in 2000, when Leola Macon first gave her first affidavit, what did she say? Was there a dinner? No. Was there a party? No. Was it a special day? No. All she said is, if I had known that May 25th was the date of the murder, I would have told you that he was with me all that day. Now, Leola Macon says she doesn't learn of the party until five years later, when the defendant's attorney tells her. What does that tell you about the alibi? She knew he was with her, but she didn't know what they were doing. But now, five years later, it's so memorable, she remembers because it was this big party. In 2001, after Stephanie Boyd Grady initiates her contact with a defendant, was there a dinner? No. Was there a party? No. Stephanie Boyd Grady's first affidavit says, I was with the defendant all night from 10 until 2. We were catching up and talking before I left for the summer. What does that tell you? Was it May 25th? No, it was June 6th, when the defendant might have passed, when school was almost over. Her brother-in-law and sister were in town in early June, when she saw Anthony to attend a graduation, a high school graduation. More likely June 6th. Lots of facts in the record to support the court's conclusion, that if there was a party, it wasn't May 24th, it was June 6th. It's only when the defense attorneys get involved in 2005 that this alibi becomes this big, fancy, very detailed alibi. And when you look at how all of these witnesses not only conflict with each other, but conflict with their own, either the 2000 affidavit or the 2005 affidavit or the 2007 interview with the state's attorney's office and their testimony at the evidentiary hearing, there are reams of contradictions. And all of those contradictions provide sound reason why Judge Coughlin absolutely was entitled to determine that they were incredible. And because the record fully supports that finding, the people respectfully request that this court affirm the trial court's denial of post-conviction relief. Are there any other questions I'd be happy to answer? Thank you. Good morning, Your Honors. Again, I'm Allison Triggs, and with Ms. Scherer I represent Anthony McNeil. I'd like to begin by addressing the state's argument that it's not appropriate to raise an actual innocence claim involving an alibi based on newly available evidence. In fact, the state misconstrues the standard. The standard is that the evidence to be newly available, the evidence must not have been available at trial. And that, in fact, is the case here, as Ms. Scherer mentioned. The evidence that proves Mr. McNeil's alibi is these three affidavits from Leola Macon, from David Macon, and from Stephanie Boyd-Grady. Those three affidavits, for the reasons that we've discussed today, were not available at trial. So it's perfectly appropriate for Mr. McNeil to be raising his actual innocence argument. You're saying that they were not available because of the ineffective assistance of counsel, correct? Well, setting aside the ineffective assistance of counsel, Mr. McNeil did not have the resources or the ability to find those alibi witnesses through any exercise of his own diligence. There was nothing that he could have done to get that information. He couldn't make a phone call to them and say, you've got to help me? At any point in time, he couldn't do that. Mr. McNeil testified that during the time that he was incarcerated before his trial, he didn't know their phone numbers and he didn't have his contact information for him. He testifies that at the time he was extradited from Indiana to Illinois, he lost his phone book, which was his only source of their phone numbers. And he also testifies that he wasn't very good with numbers, and he just didn't have their contact information. He had no resources at his disposal to find that contact information. Now, the state also asserts that it's improbable that there's no explanation for why the Makins didn't come forward sooner. And I'd just like to reemphasize what we discussed earlier, what Ms. Scher discussed, with respect to an explanation for the Makins' delay in coming forward. We know from the Makins' testimony and from Mr. McNeil's testimony that at the time before the trial, the Makins did not know the date of the murder for which Mr. McNeil had been charged and was being tried. The Makins had no reason to know that that crime had been committed on May 24th, and they had no reason to independently connect the 24th to the GED celebration. So it wasn't until after the sentencing hearing, until after Mr. McNeil's conviction, that Leola and David Makin became aware for the first time that on the evening that Mr. Gonzalez was murdered, Mr. McNeil was, in fact, at their home in Indiana. And she found out that after his sentencing, when was that? Well, at the time she came forward at the sentencing hearing and testified, and even then during her testimony she didn't know that the date of the crime was the same day as the GED exam. It wasn't until after that that she knew. I understand what you're saying. Okay. Thank you. I'd also like to address the State's assertion that the alibi that Mr. McNeil provides is improbable. The State begins by saying that it's not possible for the proctor to have looked down at an exam that had a Scantron sheet and say that it looked good. Well, in fact, Mr. McNeil testified that he took the GED exam over a long period of time in several parts. So on the day that Mr. McNeil, on May 24th, the day that Mr. McNeil took the final part of the exam, he had already known that he'd taken four other parts of the exam, I believe it was. So it's probable that after taking this fifth part, after this long period of studying for these exams and doing these GED courses, Mr. McNeil would want to celebrate that and may have a feeling as to the fact that he passed the exam. The State emphasizes all of these minor discrepancies in the testimonies of the alibi witnesses. And that emphasis on these small details is simply an effort to distract from the key point, which is that all three witnesses say that Mr. McNeil was with them on May 24th and May 25th, the night that William Gonzalez was murdered. The State also says that the details of the alibi only come forth in 2005 after the attorneys are involved. That is, in fact, not true, and it's inconsistent with what's in the record. Mr. McNeil testified at the evidentiary hearing that he told his trial counsel that he took his GED exam on May 24th, and we, in fact, have a record of him having taken it on that day. So these details that are part of the alibi were actually... None of that appeared in any of the other post-conviction papers that were filed up until the point of this particular proceeding, correct? That's correct. In the post-conviction petition that Mr. McNeil filed in 1995, he does not mention those details. And I think it's important to point out that in 1995, Mr. McNeil found out for the first time that his three-year period for filing the post-conviction petition was set to expire only 30 days before that deadline. So Mr. McNeil then, with no real resources, no legal sophistication, put together whatever he could find using the resources that were available in the prison library, and he essentially put together what was an inartful pleading that was based on boilerplate language that he found in the prison library, and he didn't have enough time to get the affidavits. So it was a pro se petition? Correct. And at that time, he just didn't have the time or the resources to get the affidavits that he needed before filing the 1995 petition. But was there any mention of the alibi in the 1995 petition? No. Mr. McNeil testified that he felt that he couldn't mention the alibi without the supporting witnesses, and he just didn't have the ability to get their affidavits in time. In fact, the testimony that was given at the evidentiary hearing does establish that Mr. McNeil was in Indiana when the crime was committed. The testimony also affirms that the party was to celebrate Mr. McNeil getting the results of his GED, and we have Stephanie Boyd-Grady's testimony, which makes it impossible to accept the other explanation for the party, which is the explanation that the state puts forward, that the party was to celebrate the results of the GED. Stephanie's testimony refutes that conclusion. She testified that she remembers traveling to Dayton, Ohio, the day after the party at the Makin's home. She testified that after returning from Dayton, Ohio, she still had two to two-and-a-half weeks left of school. And she actually testified that the school year ended in early June. Now, since Mr. McNeil did not receive the results of his GED exam until sometime after June 6th, and the school year ended in early June, the only reasonable conclusion from the evidence is that Ms. Boyd-Grady correctly recalled the date of the party as May 24th, the date that Mr. McNeil completed the GED exam. And again, it's important to emphasize Ms. Boyd-Grady that she is a mental health care provider with a master's degree in school counseling. She has an associate's degree in organizational leadership and supervision. And she had not been in contact with Mr. McNeil for well over a decade when she came forward with her testimony. She had completely extricated herself from her upbringing in Gary, Indiana. She had nothing to gain by testifying, and there is no valid reason to discredit her testimony. The state also claims that Mr. Stralka's testimony contradicts the alibi witness's testimony. But as we've discussed already today, if anything, Mr. Stralka's testimony only demonstrates that he remembers few, if any, details surrounding Mr. McNeil's trial. Mr. Stralka actually did testify that Mr. McNeil may have said that he had an alibi or that he wasn't there. He further admitted that he couldn't say with certainty that Mr. McNeil didn't mention the names of the Makins or Ms. Boyd-Grady. And again, when Judge Coghlan was making this credibility determination and deciding whether this evidence would have made a difference on retrial, he's balancing these four witnesses' testimony that Mr. McNeil was not in the state of Illinois at the time of the murder against Evelyn Nieves' trial testimony, which is weak testimony at best. Again, as Ms. Sher mentioned, the state presented 15 witnesses at trial. Only Ms. Nieves testified that Mr. McNeil was there at that time. As we've discussed, Ms. Nieves received a dramatically reduced sentence. She couldn't remember her home address at the time of trial. She provided conflicting accounts of where she lived at the time of the murder. There was no other witness that connected Mr. McNeil with the crime. There was no physical evidence that tied Mr. McNeil to the crime. Now, it's true that Martha Burgos' handprint was found on the victim's car. Now, that only places Martha Burgos at the scene of the crime. And the gun that the state presented during trial, that gun was also found in Ms. Burgos' apartment. Was part of the gun or wasn't part of it found in the bar? That's correct. Part of it was found at the bar where Ms. Burgos works. And the other part of it... The story about what happened with that when he broke the gun as he left in anger one night. Correct. In light of the strength of the three alibi witnesses' testimony and Mr. McNeil's testimony, and as balanced against Judge Strelka's uncertainty and Evelyn Nieves' incredibility, Judge Strelka's conclusion that the alibi witnesses were not credible is against the manifest weight of the evidence. Thank you, counsel. We ask that this court reverse the lower court's order denying Mr. McNeil's post-conviction and grant Mr. McNeil a new trial. Thank you. Thank you very much. The briefs were very well written, and the case was very well argued by both sides. So we will resolve it, and I thank you for the hard work that you put into this. Thank you. You're welcome.